AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)        ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

November 12, 2022

CENTRAL DISTRICT OF CALIFORNIA
BY:_____IM_____DEPUTY

United States of America

v.

IMANOL CERVANTES-PACHECO and JAIME
IVAN HENRIQUEZ,
            Defendants.

Case No.    2:22-mj-04499-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of November 10, 2022, in the county of Los Angeles in the Central District of California,

the defendants violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to Distribute Controlled Substances; |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

Adrian Owens, Special Agent,
Drug Enforcement Administration
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:        November 12, 2022

*Patricia Donahue*
*Judge's signature*

City and state:   Los Angeles, California

Hon. Patricia Donahue, U.S. Magistrate Judge
*Printed name and title*

AUSA: Rajesh R. Srinivasan, x7416

**AFFIDAVIT**

I, Adrian Owens, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against Imanol CERVANTES-Pacheco ("I. CERVANTES") and Jaime Ivan HENRIQUEZ ("HENRIQUEZ") for violations of 21 U.S.C. § 846: Conspiracy to Distribute Controlled Substances.

2. This affidavit is also made in support of an application for a warrant to search the following digital devices in the custody of the Drug Enforcement Administration ("DEA"), in Los Angeles, California (collectively, the "SUBJECT DEVICES"), as described more fully in Attachment A:

  a. a black Motorola MC380 cellular telephone ("Subject Device 1");

  b. a blue AT&T cellular telephone with one camera lens ("Subject Device 2");

  c. a blue Samsung cellular telephone with IMEI 357863/10/366996/6 ("Subject Device 3");

  d. and a black Galaxy Z Fold3 5G cellular telephone with IMEI 350237727887535 and phone number 323-394-7507 ("Subject Device 4").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy to distribute controlled substances) (the "Subject Offenses"), as

described more fully in Attachment B.  Attachments A and B are incorporated herein by reference

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

## II. <u>BACKGROUND OF AFFIANT</u>

5.    I am a Special Agent ("SA") with the DEA and have been so employed since January 7, 2018.  I am currently assigned to the Los Angeles Field Division, Financial Investigations Group, of the DEA.  The DEA Financial Investigations Group is comprised of law enforcement personnel from the DEA and the United States Marshals Service.

6.    As a DEA Special Agent, I received and completed several hundred hours of formal training at Quantico, Virginia.  I have specialized training in the investigation of violent crimes, racketeering, conspiracy crimes, and drug importation and distribution.  I received a Bachelor of Arts Degree in Criminology from Texas A&M University in San Antonio, Texas.  During my employment with the DEA, I have participated in

investigations involving individuals illegally possessing drugs and firearms.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

7.    Between November 5, 2022 and November 10, 2022, a confidential source ("CS") working with the DEA arranged a purchase of fentanyl pills with J. CERVANTES, a drug broker in Mexico.  J. CERVANTES connected the CS with a drug courier who would deliver the fentanyl pills to the CS.  On November 10, 2022, the CS met the drug courier and received approximately 1.2 kilograms of fentanyl pills.  DEA agents then detained the courier.   The courier cooperated with agents and informed them that the courier was supposed to deliver the proceeds of the sale to two people whom the courier had met earlier in the day. These two people would later be identified as I. CERVANTES and HENRIQUEZ.  At the direction of DEA agents, the courier arranged to meet I. CERVANTES and HENRIQUEZ, and DEA agents arrested both at their pre-arranged meeting locations.  DEA agents also search I. CERVANTES's residence, where they discovered approximately 1.2 kilograms of suspected powdered fentanyl.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

8.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   A Confidential Source Arranged to Purchase 15,000 Fentanyl Pills in Los Angeles through a Known Drug Source in Mexico**

9.   During the week of October 31, 2022, I contacted a DEA Confidential Source (hereinafter "CS-1")[1] and asked whether s/he knew of anyone who would sell fentanyl pills.  In response, CS-1 offered to reach out to J. CERVANTES to arrange for a sale of fentanyl pills.

10.   CS-1 told me that s/he has known J. CERVANTES for approximately 15 years.  Through conversations with J. CERVANTES, CS-1 knew him to be a member of Cartel Jalisco Nueva Generacion ("CJNG").  I am familiar with CJNG because my group has an ongoing investigation of CJNG, and I have spoken to other confidential sources and witnesses about CJNG.  I know CJNG to be a violent organization involved in major drug trafficking, firearms and money laundering.  I had previously heard of J. CERVANTES in a debriefing in 2020.

11.   On or about November 5, 2022, per the instructions of me and Agent Kevin Novick, CS-1 placed a recorded telephone call to J. CERVANTES at telephone number 52-332-946-1193 (the "-1193 Number").  CS-1 had previously used this number to contact J. CERVANTES and recognized J. CERVANTES's voice from their previous interactions.  During this telephone conversation, CS-1

_____

[1] CS-1 began working for DEA in 2020.  The CS is providing information to investigators for monetary compensation and immigration benefits.  CS-1 has previously been convicted of aggravated assault with a deadly weapon in 2008 and was deported.  The CS has provided truthful information to investigators in the past in connection with another investigation, which has been independently corroborated.  To my knowledge CS-1 has not provided any information that was later determined to be false or otherwise unreliable.

asked J. CERVANTES if he knew of someone who could sell "pastillas for a headache" in the Los Angeles area to an associate of CS-1.  Based on my conversation with CS-1, I know that "pastillas for a headache" refers to fentanyl pills.  J. CERVANTES responded that he had someone in the Los Angeles area who could fulfill this order, and J. CERVANTES asked CS-1 to have CS-1's associate contact him directly.  On November 7, 2022, via a recorded call, CS-1 provided J. CERVANTES the telephone number for another DEA confidential source ("CS-2").[2]

12.  On November 7, 2022, Agent Kevin Novick and I conducted a debriefing of CS-2.  CS-2 stated that on or about November 7, 2022, at approximately 7:30 p.m., CS-2 received a call from telephone number 52-334-483-9304 (the "-9304 Number"). The call was recorded.  The person identified himself as J. CERVANTES and indicated that he called to discuss the proposed transaction for 15,000 fentanyl pills.  J. CERVANTES told CS-2 that he was doing a favor for a "compadre."  J. CERVANTES told CS-2 that he had two people in Los Angeles who sell fentanyl pills and that each pill sells for $2.  J. CERVANTES said that J. CERVANTES is a broker and that he would earn $2,000 from this transaction.  CS-2 asked J. CERVANTES if the deal could occur on November 10, 2022, and J. CERVANTES agreed.  J. CERVANTES told

_____

[2] CS-2 began working for DEA in 2021 after s/he was arrested for possession of methamphetamine.  CS-2 had previously provided information for leniency with respect to CS-2's arrest and is currently providing information to investigators for monetary compensation.  CS-2 has previously provided information to the DEA in another investigation that has been corroborated and proven to be reliable, and has not provided any information that was later determined to be false or otherwise unreliable.

CS-2 that J. CERVANTES's son would deliver the fentanyl pills to CS-2.  J. CERVANTES advised CS-2 that J. CERVANTES would pass CS-2 the number of his son on November 10, 2022.

13.  On November 9, 2022, CS-2 contacted me to provide details on a further conversation between CS-2 and J. CERVANTES. On November 9, 2022, at approximately 2:20 p.m., CS-2 received a telephone call from J. CERVANTES from the -9304 Number.  This call was also recorded.  During the telephone call, J. CERVANTES reiterated that he would not provide the telephone number of his son to CS-2 until the day of the transaction.

14.  Later the same day, CS-2 contacted me to provide details on another conversation between CS-2 and J. CERVANTES. At approximately 7:31 p.m., CS-2 received a telephone call from J. CERVANTES from the -9304 Number.  This conversation was also recorded.  Based on my review of the recording, the use of Google's Spanish-to-English translation function, and my conversations with CS-2 and DEA Agent Kevin Novick, I learned that J. CERVANTES advised CS-2 that the transaction could not occur until after 3:30 p.m. on November 10, 2022.  In response to CS-2's request for J. CERVANTES's son's phone number, J. CERVANTES again said that he would not provide his son's telephone number until the day of the transaction.  CS-2 also understood J. CERVANTES to say his son wanted to do two transactions: one transaction with 10,000 fentanyl pills, and another transaction with either 10,000 or 5,000 fentanyl pills. J. CERVANTES said that his son wanted to conduct two smaller transactions because the police have been aggressively

investigating fentanyl distribution.  Additionally, J. CERVANTES said that the transaction would have to occur after 3:30 p.m. on November 10, 2022.

**B.   On November 10, 2022, a Courier Provided CS-2 with a Package Weighing About 1,290 Grams and Containing Fentanyl Pills**

15.  On November 10, 2022, at approximately 10:42 a.m., CS-2 contacted J. CERVANTES by calling the -9304 Number.  The conversation was recorded.  Based on my review of the recording, the use of Google's Spanish-to-English translation function, and my conversations with CS-2, I learned that J. CERVANTES told CS-2 that his son would be ready to conduct the transaction soon. Based on a conversation with CS-2, I learned that at approximately 12:30 p.m., CS-2 instead received a phone call from a different person who identified himself as an associate of J. CERVANTES'S (the "courier") and indicated that he would be providing CS-2 with the drugs.  The courier subsequently sent CS-2 a text message with a meeting address of 16210 Crenshaw Boulevard, Gardena, California.

16.  At 12:30 p.m., CS-2 met with DEA agents, including me, at a pre-determined location.  CS-2's vehicle was searched by Agent Trenton Shaffer and Agent Tiffany Hsieh.  Shortly thereafter, Agent Shaffer searched CS-2, which was witnessed and recounted to me by Agent Hsieh.  During both searches, the agents discovered no large sums of money, weapons, or drugs. CS-2 was also outfitted with an audio and video recording device.

17.  At approximately 1:30 p.m., DEA agents established surveillance at the Walmart located on South Normandie Avenue, Torrance, California.  At approximately 1:34 p.m., CS-2 gave the courier the address to the Walmart and told the courier to meet CS-2 there instead.  At approximately 2:15 p.m., CS-2 called Agent Novick and indicated that fentanyl was now in CS-2's vehicle.  Moments later, DEA agents and I arrested the courier without incident.  At approximately 2:18 p.m., I advised the courier of the courier's Miranda rights, as witnessed by Agent Adam Cirillo.  The courier waived his rights and chose to speak to me and the other agents.[3]  The interview was recorded.

18. Based on an interview of the courier following his arrest and an interview later that night, during which the courier again waived his Miranda rights, I learned about the courier's involvement in the drug deal.

    a.   The courier stated that in the beginning of the day on November 10, 2022, the courier had received a telephone call from J. CERVANTES on the courier's personal cellular telephone.  The courier had previously met J. CERVANTES in Mexico and recognized J. CERVANTES's voice.  The courier had also previously borrowed money from J. CERVANTES.

    b.   During this call, J. CERVANTES said that he had something urgent for the courier to do.  J. CERVANTES sent

_____

[3] The courier is providing information to investigators in hopes of consideration with respect to charges.  The courier has not received monetary compensation.  During the initial communication with CS-2, the courier was not cooperating with DEA.

the courier I. CERVANTES's telephone number and told the
courier to tell the person at that number that he was
calling on behalf of J. CERVANTES.  Based on my review of
the courier's personal cellular telephone, in addition to
my interviews of the courier, I learned that the number
that the courier was instructed to call was saved as "Ameca
JL2" on the courier's personal cellular telephone.

     c.   The courier arranged to meet with this person to
obtain another cellular telephone ("second phone").  This
person was later identified as I. CERVANTES.

     d.   The courier began receiving instructions on that
second phone from a person using the -9304 Number.  This
telephone number was saved on the courier's second phone as
a contact named "SM Jal."  Based on prior conversations
with CS-2, I recognized this to be the same number CS-2 had
used to communicate with J. CERVANTES, and the courier told
me that "SM Jal" was J. CERVANTES.  The courier and the
person who gave the courier the second phone -- I.
CERVANTES -- were initially planning to ride together to
the meeting with CS-2.  But J. CERVANTES changed his mind
and told the courier that the courier would be going alone.

     e.   J. CERVANTES instructed the courier to call a
contact saved as "El Jimmy" on the courier's second phone.

     f.   The courier contacted El Jimmy, who instructed
the courier to go to the Superior Grocers to "pick up
stuff" from a male in a red Toyota Matrix.  The courier met
a male driver of the red Toyota Matrix, and the driver --

El Jimmy -- gave the courier the fentanyl pills.  The courier described the person in the red Toyota Matrix as an older male with a white goatee and fair skin.  Based on my encounter with HENRIQUEZ later that day, as described below, HENRIQUEZ is an older male with a white goatee and fair skin.  The courier also reported that the person in the car was the same as the person he spoke to earlier, namely, El Jimmy.

g.   The courier called J. CERVANTES, and J. CERVANTES then instructed the courier to meet with CS-2, deliver the fentanyl pills, and receive the money for the fentanyl pills.  J. CERVANTES told the courier to take half of the money to I. CERVANTES and the other half of the money to the person he met at Superior Grocers.  Once the courier gave the money to the person he met at the Superior Grocers, that person would give the courier additional 10,000 fentanyl pills to deliver to CS-2.

19.  At approximately 2:20 p.m., Agent Hsieh located a package weighing approximately 1,290 grams (1.290 kilograms) and containing suspected fentanyl pills in the front passenger seat of CS-2's vehicle.  The suspected fentanyl pills were condensed in a brick with brown wrapping and enclosed in a plastic bag that was partially open.  The package was weighed after being placed in two evidence envelopes.

C.   **The Courier Travels to Deliver a Portion of the Money from the Sale of the Fentanyl to I. CERVANTES**

20.   The courier agreed to cooperate with the investigation, and at 2:23 p.m., the courier placed a controlled and recorded telephone call to "Ameca JL2" by calling telephone number 747-253-3872 (the "-3872 Number").  During this call, the courier told that person, whom the courier referred to as "Mecca" to DEA agents and was later identified as I. CERVANTES, that the courier would meet him at a location that the courier would identify later.  At approximately 2:31 p.m., the courier engaged in a controlled and recorded telephone call to J. CERVANTES at the -9304 Number.  During this telephone conversation, the courier advised J. CERVANTES that the courier had met with CS-2 and that CS-2 did not want to wait for the courier to drive to the two people that the courier had met earlier in the day to get the remaining fentanyl pills and that CS-2 wanted the pills immediately.

21.   At approximately 2:36 p.m., the courier placed another controlled and recorded telephone call to J. CERVANTES at the 9304 Number.  During this conversation, J. CERVANTES asked the courier if the courier had already "dropped off and picked up."[4] The courier responded that the courier was still with CS-2.  J. CERVANTES told the courier to leave the location for security reasons.  J. CERVANTES said that once the courier left the location, the courier should go into the bathroom of a restaurant and meet Mecca -- later identified as I. CERVATES --

---

[4] Translation from Spanish to English.

there.  J. CERVANTES told the courier to call him back after the
courier met with Mecca.  J. CERVANTES added that the courier
should not send Mecca the meeting location until the courier had
left the courier's current location at the Walmart on South
Normandie Avenue.

22.  At approximately 3:07 p.m., the courier engaged in
another controlled and recorded telephone call with J. CERVANTES
at the -9304 Number.  I debriefed the courier on this
conversation.  During this conversation, J. CERVANTES asked the
courier if everything was OK and instructed the courier to give
$12,000 cash to Mecca (I. CERVANTES) and $8,000 to another
unidentified person.

23.  At approximately 3:13 p.m., the courier engaged in a
controlled and recorded telephone call with I. CERVANTES using
the same -3872 Number that J. CERVANTES had previously provided.
During this telephone conversation, I. CERVANTES confirmed the
$12,000 amount, and told the courier that he was 35 minutes away
from the McDonalds, located on Hawthorne Boulevard, Inglewood,
CA, which the courier provided to I. CERVANTES as a meeting
location.

24.  At approximately 3:44 p.m., the courier engaged in a
controlled and recorded telephone call with I. CERVANTES.
During this telephone conversation, I. CERVANTES told the
courier that he was almost at the McDonalds and would be driving
a white Toyota Corolla.

25.  DEA agents set up surveillance in and around the
parking lot of the McDonalds to look for a white four-door that

the courier had seen when he met Mecca -- I. CERVANTES --
earlier in the day.

26.  At approximately 3:51 p.m., the agents located a white
Toyota Corolla and made contact with the driver.  By looking at
his driver's license, a photograph of which I later viewed, DEA
agents identified the driver as Imanol CERVANTES-Pacheco (I.
CERVANTES).  Furthermore, I. CERVANTES admitted that his father
was J. CERVANTES.

27.  I. CERVANTES was placed under arrest.  I. CERVANTES
initially agreed to cooperate with investigators and provided
consent to search his car.  Subject Device 1 and Subject Device
2 were discovered on I. CERVANTES's person.  Subject Device 3
was discovered in the center console of I. CERVANTES's white
Toyota Corolla, bearing California license plate 7FJA762, which
is registered to HASSEL CISNEROS GARCIA.  At approximately 4:00
p.m., I. CERVANTES agreed to place a call to J. CERVANTES, which
was not recorded.  I. CERVANTES told me that he advised J.
CERVANTES that he received the money from the courier.
Additionally, I. CERVANTES told agents that there were drugs at
his residence, on top of the refrigerator, and he gave written
consent to search of his residence, which is described further
below.

**D.    At J. CERVANTES's Direction, the Courier Traveled to
Deliver the Remainder of the Money from the Fentanyl
Sale to HENRIQUEZ**

28.  Based on conversations with Agent Novick, I learned
that at approximately 4:09 p.m., the courier engaged in a
controlled and recorded telephone call with J. CERVANTES.

According to Agent Novick, the courier told J. CERVANTES that
the courier had given the fentanyl pill proceeds to the person
known to him as "Mecca" and known to me as I. CERVANTES.  J.
CERVANTES asked the courier if I. CERVANTES was OK, because I.
CERVANTES's voice sounded different during their call, and the
courier reassured J. CERVANTES.  J. CERVANTES instructed the
courier to give $8,000 to the person saved in the courier's
second phone as "El Jimmy" at the telephone number 323-394-7507
(the "-7507 Number").  J. CERVANTES also told the courier to
call CS-2 to see if he wanted "more."  Based on my training,
experience, and knowledge of this case, I understood "more" to
mean more fentanyl pills.

29.  At approximately 4:39 p.m., the courier engaged in a
controlled and recorded telephone call with "El Jimmy" by
calling the -7507 Number.  During this conversation, the courier
told El Jimmy that he was going to give El Jimmy the money and
pick up "the other."  El Jimmy confirmed that they would meet ay
Superior Grocers on Crenshaw Boulevard, Gardena, California.
Based on my training, experience, and knowledge of this case, I
believe that picking up "the other" is coded language for
picking up the remaining fentanyl pills.

30.  At approximately 5:19 p.m., the courier engaged in a
controlled and recorded telephone call with El Jimmy.  During
the telephone conversation, El Jimmy said that he was at the
Superior Grocers in a white Lexus.

31.  At approximately 5:24 p.m., other DEA agents located a
white Lexus GS 350, bearing California license plate 5ZCF099,

and then other DEA agents and I made contact with the driver and another passenger. By reviewing their driver's licenses, I identified the driver as Jaime Ivan HENRIQUEZ ("HENRIQUEZ") and the passenger as Juan PADILLA ("PADILLA"). I believe that "El Jimmy" was HENRIQUEZ because, as noted above, he matched the courier's description of the driver of a red Toyota Matrix who had given the courier fentanyl pills earlier in the day. After a search of the Lexus, PADILLA was released, and HENRIQUEZ remained in custody. Subject Device 4 was acquired from HENRIQUEZ's car at the time of his arrest, and HENRIQUEZ admitted that the phone was his and the other passenger identified it as HENRIQUEZ's phone. DEA Agent Novick placed a call to the -7507 and identified it as the telephone number of Subject Device 4.

32. At approximately 10:22 p.m., Agent Shaffer, Agent Cirillo, and Intelligence Analyst Wu conducted a post-arrest interview with HENRIQUEZ. The interview was recounted to me by Agent Shaffer and I have reviewed his notes of the interview. Prior to the interview, Agent Shaffer advised HENRIQUEZ of his Miranda rights, and HENRIQUEZ elected to provide a statement and signed a written waiver of his rights. During the interview, HENRIQUEZ stated that an individual by the name of "BB" with a telephone number of 52-667-780-8633 (the "-8633 Number") organized the money pickup and told HENRIQUEZ where to go via WhatsApp. When agents questioned what the money was for, HENRIQUEZ said, "These are things I just don't ask." HENRIQUEZ stated that the courier contacted him, told HENRIQUEZ where to

meet with him, and told HENRIQUEZ that he got HENRIQUEZ's number from "BB."  Based on my knowledge of the case, I believe that "BB" is J. CERVANTES.  Agent Shaffer asked HENRIQUEZ if he knew he was picking up money for illegal stuff, and HENRIQUEZ responded "yes."

### E.   Additional Fentanyl Was Recovered During a Consensual Search of I. CERVANTES's Home

33.   At approximately 7:40 p.m., Agent Shaffer and Agent Cirillo obtained a written consent from I. CERVANTES to search I. CERVANTES's residence at 13349 Saticoy Street, Apartment 9, North Hollywood, California, where I. CERVANTES's child and the mother of his child also reside.  At approximately 7:50 p.m., DEA agents conducted the search.  Agent Chang and Agent Cirillo recovered approximately 1,230 grams (1.2 kilograms) of suspected powdered fentanyl from on top of the refrigerator.  The suspected powdered fentanyl was concealed inside of a Cheerios cereal box.  The suspected powdered fentanyl was placed in evidence bag, which was placed in another evidence bag and weighed.

34.   At approximately 11:30 p.m., Intelligence Analyst Wu and I conducted a post-arrest interview of I. CERVANTES.  During the interview, I advised I. CERVANTES of his Miranda rights.  I. CERVANTES said that he wanted his attorney present and asked for a Spanish speaker.  Agent Novick spoke with I. CERVANTES in Spanish.  I. CERVANTES told Agent Novick that he wanted an attorney but then changed his mind and said he wanted to speak to investigators.  I. CERVANTES was advised that he should

indeed consult with his attorney and the interview was terminated.

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

35.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In

17

addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

       d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

       e.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

### VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

36.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

37.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

38.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

c.   In addition, this investigation involves five SUBJECT DEVICES.  Given the amount of data that digital devices can store, each of devices may take a substantial time to search.

39.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress HENRIQUEZ's and I. CERVANTES thumb and/or fingers on the devices; and (2) hold the devices in front of HENRIQUEZ's and I. CERVANTES's faces with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

40.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. **CONCLUSION**

41.  For all the reasons described above, there is probable cause to believe that I. CERVANTES and HENRIQUEZ violated 21 U.S.C. § 846: Conspiracy to Distribute Controlled Substances. There is also probable cause to believe that the items listed in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 12th day of
November 2022.

*Patricia Donahue*
_____
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

PROPERTY BE SEARCHED

The following digital devices (the "SUBJECT DEVICES"), which were seized on November 10, 2022, and are currently maintained in the custody of the Drug Enforcement Administration in Los Angeles, California:

1.    A black Motorola MC380 cellular telephone ("Subject Device 1") seized from I. CERVANTES;

2.    A blue AT&T cellular telephone with one camera lens ("Subject Device 2") seized from I. CERVANTES;

3.    A blue Samsung cellular telephone with IMEI 357863/10/366996/6 ("Subject Device 3") seized from I. CERVANTES; and

4.    A black Galaxy Z Fold3 5G cellular telephone with IMEI 350237727887535 and phone number 323-394-7507 seized from HENRIQUEZ ("Subject Device 4").

## ATTACHMENT B

**ITEMS TO BE SEIZED**

1.    The items to be seized are fruits, instrumentalities, and evidence of violations of 21 U.S.C. § 846 (Conspiracy to Distribute Controlled Substances) and 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute Controlled Substances) (collectively, the "Subject Offenses"), namely:

a.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

b.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

c.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

d.    Records, documents, programs, applications, materials, or conversations relating to the trafficking of

i

drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

e.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

f.   Contents of any calendar or date book;

e.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

f.   Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

g.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

as well as evidence of the presence or absence of security
software designed to detect malicious software;

      iii. evidence of the attachment of other devices;

      iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

      v.   evidence of the times the device was used;

      vi.  passwords, encryption keys, and other access
devices that may be necessary to access the device;

      vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

      viii.    records of or information about
Internet Protocol addresses used by the device;

      ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "information,"
"documents," "programs," "applications," and "materials" include
records, information, documents, programs, applications, and
materials created, modified, or stored in any form, including in
digital form on any digital device and any forensic copies
thereof.

**SEARCH PROCEDURE FOR THE SUBJECT DEVICES**

3.    In searching the SUBJECT DEVICES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.    The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.    The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital devices and/or forensic images thereof beyond this 120-day period without obtaining an extension of time order from the Court.

d.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also

search for and attempt to recover deleted, "hidden," or
encrypted data to determine, pursuant to the search protocols,
whether the data falls within the scope of the items to be
seized.

        ii.  The search team may use tools to exclude
normal operating system files and standard third-party software
that do not need to be searched.

        iii. The search team may use forensic examination
and searching tools, such as "EnCase," "Griffeye," and "FTK"
(Forensic Tool Kit), which tools may use hashing and other
sophisticated techniques.

        e.  The search team will not seize contraband or
evidence relating to other crimes outside the scope of the items
to be seized without first obtaining a further warrant to search
for and seize such contraband or evidence.

        f.  If the search determines that a SUBJECT DEVICE
does not contain any data falling within the list of items to be
seized, the government will, as soon as is practicable, return
the SUBJECT DEVICE and delete or destroy all forensic copies
thereof.

        g.  If the search determines that a SUBJECT DEVICE
does contain data falling within the list of items to be seized,
the government may make and retain copies of such data, and may
access such data at any time.

        h.  If the search determines that the SUBJECT DEVICE
is (1) itself an item to be seized and/or (2) contains data
falling within the list of other items to be seized, the

government may retain the digital device and any forensic copies
of the digital device, but may not access data falling outside
the scope of the other items to be seized (after the time for
searching the device has expired) absent further court order.

        i.   The government may also retain a SUBJECT DEVICE
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),
including in circumstances where the government has not been
able to fully search a device because the device or files
contained therein is/are encrypted.

        j.   After the completion of the search of the SUBJECT
DEVICES, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

    4.   The review of the electronic data obtained pursuant to
this warrant may be conducted by any government personnel
assisting in the investigation, who may include, in addition to
law enforcement officers and agents, attorneys for the
government, attorney support staff, and technical experts.
Pursuant to this warrant, the investigating agency may deliver a
complete copy of the seized or copied electronic data to the
custody and control of attorneys for the government and their
support staff for their independent review.

    5.   During the execution of this search warrant, law
enforcement is permitted to (1) depress HENRIQUEZ's and I.
CERVANTES thumb and/or fingers onto the fingerprint sensor of

the SUBJECT DEVICES (only if the device has such a sensor), and direct which specific fingers and/or thumbs shall be depressed; and (2) hold the device in front of HENRIQUEZ's and I. CERVANTES's faces with their eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

6.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.